Before we begin, Judge Breyer and I like to say that we're delighted to be sitting with an old friend, the Honorable Stephen Murphy from District Court, Michigan. He's back down here in good autumn time. Thank you, sir. We'll begin with United States v. Atkins. Mr. Parker. Thank you very much, Your Honor. Mr. Parker, I don't mean to interrupt, but let me, I've been trying to squeeze this case down to the size of a pea, and let me express how I see it, and then you go from there. If, and I'm going to call the big debtor, Kennedy's, the Kennedy's, if they can't pay, and the bank, the South forecloses, they have a deficiency judgment, they get a personal judgment against the Kennedy's, the borrowers, then Gulf Coast lien evaporates at the foreclosure sale, and the bank winds up with the property. As it was, they released the Kennedy's and took, and the property moved to these nominees, and the bank wound up with the property anyway. Is that sort of a, and Gulf Coast released their liens, otherwise they've been wiped out anyhow. Correct. This was an effort to avoid the bankruptcy, threaten bankruptcy court. I understand. To keep the bank out of bankruptcy court, to get control over the properties, and so Atkins, Cobb, went out, sought. Yeah, but banks, but Bank South loses anyhow. It's, lien isn't worth anything. Gulf South. Gulf South, I'm sorry. Gulf South's lien is worthless. It gets wiped out in a foreclosure if they'd gone ahead and foreclosed on the original debt, and got a deficiency judgment at the foreclosure. I will accede to the court's knowledge of the Florida real estate law. I'm not Well, anyway, it would get wiped out. I believe that's the case. And all the community bank was interested in was that the debtor didn't get money at these closings. Correct. And they didn't. Kennedy wasn't given any money. No, sir. He wasn't given any money. He got, he unloaded the properties without his LLCs being held responsible, and they were transferred back to Gulf South on its books. They were non-performing assets, and they were placed in, or sold, or whatever the appropriate description to these nominee buyers. And those individuals were recruited by Atkins and Cobb, and they were individuals who they knew personally. They were individuals who agreed to the deal because they were told they would get 100% financing, and they were told It was as if the bank had taken the property in lieu of foreclosure, and they're looking to sell it. Correct. Correct. And they found some people to sell it to. And Atkins, based on his scheme to, quote, kick the can down the road, was looking to defer having to recognize these assets as non-performing and wipe them off the books. If we got out of the doldrums, maybe the property values would go back up again. Correct. And then they would be sold to, at an arm's length, transaction. That's the P, I gather, to the court. That's not the size of it. I'm not saying it's not criminal. Right. That's the size of it. Well, as the district court noted in the sentencing of Mr. Atkins, if you just had qualified buyers, there'd be nothing wrong with this at all. And, but what the point about our case is, is that this was not a charge against Atkins or Cobb or anybody in count one, as if the non-qualified buyers had submitted false documents as to their loan applications. In fact, there's nothing to, was never proven about the loan applications one way or the other. This is an after the fact, after the loans were fully funded, you know, we had these HUD ones created. The government had a theory of falsity. And as the district court noted, that wasn't grounded in law or rule or regulation. There's nothing that requires in the form cash from borrower that you can't put money's loan from the bank. The money's in this case. What you're saying then is that four or five individuals can get together and devise a mail fraud scheme and conspire to defraud property from a victim and then claim there's no insufficient evidence to support a jury verdict if a mailing occurs after all the plans have been made. Right? That's the essence of your argument here. If there's, and then claim I didn't quite catch your last point. There's a mailing made, right, through the U.S. mails to effectuate the scheme after all the planning's been carried out. Well, first off, with all due respect, your honor, count one is a bank fraud scheme under 1344-2, which requires a causation element to be proven. Right. The ends, the means justified or made the ends. Well, there's no case that's ever said you've got to carry out the scheme by specifically supporting or submitting false information before the fact, which is your argument here. Well, the argument is there has to be a connection based on Longren under the Supreme Court analysis of the alleged falsities. We're not talking about whether there's a material misrepresentation. There has to be a causation of the event. And here it was already agreed and fully funded before any document was made and no one, none of the borrowers read the documents. They had no knowledge of falsity. Let's ask the question this way. Had the straw buyers refused to sign the closing documents, the closing wouldn't have gone through, would it? I don't know because the monies were in the hands of the escrow people. I would assume not, but that's an assumption. Sale would not have been completed. What was the whole point of all these false documents? Because that's part of what the bank required was the documentation for the closing of the loans. There you go. But no borrower knew there was anything false, Judge Pryor. No borrower read any of these documents except Cody on the HUD-1 and the HUD-1 as a matter of law was not false. Certainly contrary to what the borrowers had been told the terms were. The borrowers claimed the terms were non-recourse. The bank generated its own security agreement consistent with what its software program generated and it was with recourse. It wasn't false against the bank. If there was any falsity, it was fraud in the inducement by Cobb and by Atkins to the borrowers, not fraud submitted with intent to deceive the bank, Gulf South. That is where there is an abject failure of proof. And that is what we have pointed out. The counts 2 through 5, as no maker knew the contents of any of the agreements they signed, the agreements were not false. That's an element of the offense. That this 2 through 5, the liability is an aiding and abetting basis of theory. The government concedes Atkins didn't make anything. None of the borrowers knew any of the security agreements were allegedly false or not. None of them read it. They didn't read it because the monies had already been fully provided. The loans had been funded. They didn't need to read it. They had been told that it was one thing when the document said it was something else. But that's why when they submitted what was submitted, it was never submitted and there's no evidence of an intent to deceive Gulf South. I mean, yeah, Gulf South trying to keep the difference of banks apart. Therefore, there was no evidence to prove those counts of an intent to deceive because they weren't deceiving. Atkins wasn't deceiving himself. There's no evidence of Atkins preparing any of those documents. The Supreme Court has said that the government doesn't have to prove that the defendant specifically intended to defraud a bank. No, but you have to have the subjective intent for counts two through five in executing and submitting a false statement that it is an intent to deceive. If you submit documents that say that the terms of the loan are one thing, when you actually have a side agreement with the borrowers that the terms are something else, then they're false documents. They're only false as to the borrower, not as to the bank. The bank was fully secure. They're nevertheless false. Pardon? They're nevertheless false. That's not going to be the actual agreement. But not as to the bank. The statute covers submitting a false statement to the bank. Which gets back to the point I made earlier, which is that the Supreme Court said that you don't have to prove that you specifically intended to defraud a bank. You do have to knowingly submit false documents and they didn't know they were submitting any documents false or otherwise. I'm with you on that. And as I said, the documents were false because they purported to say that the terms of the loan were one thing when in fact they had a side agreement that they were something else. They were false. As to the borrower. Oh, here we go back to the point about who you have to be intending. But that's why there wasn't unanimity in the agreement. You see, that's the whole point. There wasn't unanimity in the agreement as to the manner and means by which this would be carried out. In fact, if you look at the testimony of the borrowers at the trial, they professed innocence to the offenses to which they were testifying about. Well, of course they did. They wouldn't have done it if they knew what was really up, right? Well, they had pled guilty and they were identified as co-conspirators. And that's the evidence of the intent right there is that your client didn't tell any of these people or give them the opportunity to reason to sign and understand what was going to make the fraud work. Well, that wasn't going to make the fraud work. The fraud was, I mean, he had full authority, Your Honor, he had full authority to issue the loans under his loan authority. He did that. He didn't rely on any of these documents. Let me just briefly say as to Count 6, the government admits that the property, that there are no property rights on that lien going back to, Your Honor, Judge Shoflat's observation. That's an intangible property. Florida law says so. That should be reversed. And as to Count 7, it would be— Wait a minute. Why should that be reversed? Smith v. Padichdal, which is a Florida Supreme Court case, states pretty outright that a lien is, quote, itself a species of intangible property. And we know that under U.S. v. Schatz, intangible property supports conviction under the Bank Fraud Act. So why in the world would we reverse on that ground? Because under Siegelman of this Court, intangible property or intangible rights are only within the scope of 1341 if it's a kickback or bribery scheme. This is not a kickback or bribery scheme. That's not what the case says. You assert that that's what the case says, but it doesn't. Judgment lien doesn't create an estate or right of property in the lands to which the later in the case, Seaboard says what I just quoted to you flat out. Such a lien is itself a species of intangible property. I don't see how you get around that. As to Count 7, I offer the additional information found in SVET that a scheme to defraud requires proof that a material misrepresentation is calculated to deceive another out of money or property. Also in Hanson of this Court, 333-312-70, a misrepresentation's material, if it is capable of influencing the decision maker to whom it is addressed. The filing of a document in the courthouse in Henry County, Alabama was not a representation that's material as it was a public filing. Thank you. I'll reserve the balance of my time to rebuttal. May it please the Court, Counsel. I think part of the problem we've heard here again today is that the defendant thinks he's the bank and the defendant is not the bank. The defendant was the author of the scheme. He was the puppeteer. So there's no question about that. Right. So, I mean... Who was defrauded? Well, the issue as to Count 1 was it was a scheme to defraud. I understand. Was it Bank South? Gulf South. Gulf South. The scheme was to... Atkins Bank was defrauded. Right. The scheme was to get property from Gulf South Bank, which the defendant did. Not only were these properties... His scheme was to take property from the bank. Take property from the bank. Personally. Excuse me? Personally. Well, the scheme, I mean, the bank took... He took $184,000 plus, just over and above what the loans were to pay those lines of credit. So it benefited him. It definitely benefited him because he wanted the bank to succeed and he got bonuses when the bank succeeded. That was the purpose of the fraud. Right. The purpose of the fraud was perhaps noble. He didn't want the bank to fail. He didn't want to lose a bunch of money on these condominiums that were obviously not worth what the bank had originally thought they were worth, right? Right. All right. So how does the purpose of the fraud play into the statutory requirement to prove the means by which it was operated? That's a softball question. Well, I mean... It doesn't matter, right? I mean... No, it was the scheme, whether he was successful or not. The purpose of the fraud doesn't matter, does it? No, he perpetrated the fraud and he was trying to do this to help him, to help his friends, to help the bank. But the point is that he had the scheme and the scheme was to take property.  bank. These men didn't have to read any of the documents because they knew it was false. They said the defendant knew we couldn't afford it. The defendant knew we couldn't qualify for the loans. Of course, I didn't make enough money to get a $1.2 million loan. There was no reason to read the documents because they knew they were false. So they signed documents knowing they were false statements and the defendant set up the false statements. So he aided and abetted in those. The documents didn't make any difference because the deals were going forward anyway. Right. So how was the bank in any way influenced? They were capable of being influenced. His statements were capable, the statements they made were capable of influencing the bank to release the funds. They weren't capable of influencing Atkins. Excuse me? They weren't capable of influencing the loan officer. Right. They were capable of influencing the bank. Mr. Atkins is not the bank. In the abstract, that's what you mean. Right, exactly. Um, as far as the scheme to defraud Gulf Coast, Gulf Coast would have had, they filed the lien. They went through everything with Kennedy and they tried to get the loans to work. They tried to do everything they could and at the last minute, there was nothing they could do. They filed the liens in every place they possibly could. Any place that Kennedy did business, in any event, any possibility to get any money out of Mr. Kennedy, they had the liens filed to protect their bank. When the defendant lied to them and told them it's short sales, don't worry. Banks make decisions based on representations of other banks all the time. That's how they work. Chemical, the community bank's liens were worthless, weren't they? Maybe they weren't. No, no, no. What happens, what happens if Bank South forecloses on the Kennedy? Whatever. Well, Gulf Coast Bank had the liens. I understand that. What happens if the property is foreclosed? Their lien evaporates. If it foreclosed, yes, but they still would have had a right. If there was some money, the fact is that it was material to the bank. If there was, if the property was worth more, they could have bid in at the foreclosure sale. They could have, sure. Yeah, but the property, nobody agreed that the property wasn't worth it. Do you agree with that? Well, ultimately, it wasn't worth it, but they had a right. Does anybody believe it was worth more money than the debt? It wasn't worth more money than the debt, but they could have gotten money from Mr. Kennedy. Nobody believed it was worth more money from the debt? No. Okay, the community bank was worried about, at these closings, that the Kennedys might get some money. Right. And they didn't get any. Or someone would have gotten money. They didn't get any. They didn't get any money. Okay. But somebody, there was a pot of money floating around, and they didn't have to release their lien, but for the lie, they would not have released it, and they may have gotten some money from Kennedy some other way at some other time. But they released their lien. That doesn't stop them from getting money from the Kennedys. Excuse me? No, they had liens against the Kennedys in several counties. They did. Right. But in any way, in any event, they said it was material to them, and if they had not known it was a true short sale, they would have not gone through with it. And as you've indicated, the mail fraud. Mr. Atkinson, there were $205,000 worth of assets that the bank could have gone after, and once the defendant released that security on the lot, there was nothing for the bank, so there was an injury there. Thank you. The government, Ms. Hess just made the comment that, in reference to accounts two through five, that they, being the borrowers, did not have to read the documents because they knew they were not qualified. The documents in question, as alleged in the indictment, are not the loan applications, which would identify whether somebody's qualified or not. The documents were these HUD ones, matter of law, could not be false, and these security agreements, okay? Whether you're qualified for the loan or not, there's no inference to be drawn about whether the security agreement was with recourse or without recourse. So that point is not correct. Getting directly to the point of whether Atkins got any money, he got no money from this activity. He did get a bonus that the board voted on after the fact, a bonus that the board voted on, by the way, these loans after they had been made as well. So I would suggest that there still is no evidence that the documents, specifically the security agreement, were submitted with an intent to deceive Gulf South Bank, I mean Gulf Coast Bank. No, I'm getting confused myself. In that regard, we rely on the arguments in our briefs and the less other questions from the board. I think we understand your position. Next case is Security Walls v. NLRB.